# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 30, 2012

No. 11-40244

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

DALE ALLEN RICHARDSON, JR.,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, DAVIS, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

A jury convicted Dale Allen Richardson, Jr. of two counts of corruptly endeavoring to obstruct the due administration of justice, in violation of 18 U.S.C. § 1503, and one count of knowingly making a materially false statement to a governmental agency, in violation of 18 U.S.C. § 1001. The district court sentenced Richardson to 65 months of imprisonment, followed by a three-year term of supervised release. Richardson challenges the sufficiency of the evidence supporting his three convictions; the district court's refusal to instruct the jury in accordance with his proposed jury instruction defining "corruptly" for purposes of 18 U.S.C. § 1503; and the district court's application of five

No. 11-40244

enhancements to his offense level in calculating his guidelines range. We AFFIRM.

I.

A.

The following facts and evidence were brought to light during Richardson's trial. On April 13, 2010, a United States immigration judge ordered Jose Fernando Reyes removed from the United States to Mexico. Reyes waived his right to appeal the immigration judge's order; he was removed on April 26. Reyes's mother, Lazara Saucedo Martinez, learned from a friend that Richardson was an immigration attorney who could help her son. She visited his law office in the Dallas, Texas area and, under the belief he was an attorney, hired him to represent her son. Martinez testified she never paid Richardson a fee for representing her son, but she did agree to refer clients with immigration issues to him.[1]

On May 12, 2010, Richardson entered his appearance as Reyes's attorney before the Board of Immigration Appeals, stating that he was admitted to practice in the Commonwealth of Massachusetts and the Cherokee Nation,[2] and filed an appeal of the immigration judge's order that had removed Reyes to Mexico. This latter action was done notwithstanding the fact that Reyes had already been removed from the country.

---

[1] During an interview with the FBI, Reyes indicated that his mother may have paid Richardson $2,500 to retain his services and an additional $2,000 or $3,000 for subsequent services. During the sentencing hearing, the district court found that Martinez had lied about only providing referrals in exchange for Richardson's legal services.

[2] On April 28, and May 5, 2010, Richardson also entered a notice of appearance as an attorney in the United States Immigration Court in Dallas, Texas, on behalf of Adriana Valle Chaparra and Jorge Armando Ramirez, respectively.

No. 11-40244

On or about June 1, 2010, Reyes reentered the United States. He was picked up by United States Border Patrol agents on June 3 and charged by criminal complaint with misdemeanor illegal reentry, in violation of 18 U.S.C. § 1325. On June 4, Reyes and Richardson appeared in the United States District Court, Southern District of Texas, Laredo Division, for Reyes's initial appearance hearing before United States Magistrate Judge J. Scott Hacker ("Judge Hacker"), in the criminal case captioned, *United States v. Jose Fernando Reyes*, No. 5:10-PO-3410. Before the hearing began, Richardson approached Judge Hacker's case manager, Debbie Flores, and indicated to her that he was representing Reyes. Flores then notified Judge Hacker that Richardson was a private attorney from Dallas and would be representing Reyes. She later reflected on the minute entry that "Attorney Richardson" appeared on behalf of Reyes. That day, Assistant United States Attorney Andy Guardiola ("AUSA Guardiola") was handling the initial appearance hearings before Judge Hacker. Richardson approached AUSA Guardiola before the hearing began, handed AUSA Guardiola his business card,[3] and stated that he was representing Reyes. He then advised AUSA Guardiola that Reyes had an appeal pending in immigration court and requested that the Government dismiss the misdemeanor illegal reentry charge so it would not affect the appeal.

When Judge Hacker called Reyes's case, as is customary, Richardson identified himself and advised the court that he was representing Reyes. Judge Hacker testified that, although Richardson never expressly stated he was an

---

[3] Richardson's business card was entitled: "U.S. Immigration Attorney, Abogado de Migracion." Below the title, the card stated: "Dale A. Richardson, Esq. Attorney and Counselor at Law." The card also listed an address, telephone number, fax number, and website address for Richardson's law firm.

attorney, when an individual announces in court that he is "representing" a party, the judge and the other persons in the courtroom expect him to be an attorney licensed to practice in that state and jurisdiction. AUSA Guardiola informed Judge Hacker that he had been advised by Richardson that Reyes had an appeal pending in the immigration court. In order to further review those facts, AUSA Guardiola asked Judge Hacker to reset the initial appearance hearing. Judge Hacker obliged and reset the hearing for June 29, 2010. Upon learning that the case would be reset instead of dismissed, Richardson said something to the effect that dismissal was needed that day because Reyes had a court date in the removal matter and a reset would add another hurdle to that appeal. In response, AUSA Guardiola indicated that he would need to consult with his supervisor before taking action beyond the reset.

When asked about Richardson's courtroom demeanor that day, Judge Hacker testified that "a lot of things" Richardson did in court did not make sense. He explained that Richardson used legal terminology and conducted himself during arguments in such a way that Judge Hacker believed him to be confused. Because of his expectation, however, that Richardson was an attorney, Judge Hacker simply believed that Richardson was newly graduated from law school with no experience. Richardson's demeanor or actions never led Judge Hacker to believe Richardson was not a licensed attorney.

On June 29, 2010, Judge Hacker reconvened Reyes's initial appearance hearing. Richardson again appeared on Reyes's behalf, which was reflected in the minute entry. Judge Hacker asked counsel whether the case had been resolved or whether the Government planned to move forward. In response, Richardson said he needed to speak with Assistant United States Attorney

No. 11-40244

Frank Pimental ("AUSA Pimental"), who was handling the cases that day. Judge Hacker agreed. After conferring, AUSA Pimental informed Judge Hacker that, after having spoken briefly with AUSA Guardiola and based on Richardson's representations about Reyes's appeal pending in the immigration court, the Government moved to dismiss the misdemeanor illegal reentry case. During questioning from Judge Hacker, AUSA Pimental revealed his understanding from Richardson that Reyes had entered into deferred adjudication on a felony drug charge, but prior to the end of the probationary period, the immigration judge had ordered Reyes removed to Mexico. Thus, there was some concern on the Government's part that Reyes's removal may have been improper, which would imperil the basis for the illegal reentry charge. As a consequence, the Government wanted to place Reyes back in status quo for his immigration appeal. Judge Hacker asked Richardson questions thereafter. Richardson never expressed any disagreement with AUSA Pimental's reasoning for moving to dismiss the illegal reentry case, and may have even nodded in agreement when AUSA Pimental explained his reasoning to the court.

Judge Hacker signed the order dismissing the illegal reentry case against Reyes on June 29. Before it could be filed and docketed, however, Judge Hacker was informed by the Clerk's Office that it could not verify that Richardson was a licensed attorney. Judge Hacker testified that he decided to withhold the order's filing for three reasons: (1) he did not know whether the U.S. Attorney's Office would still want to dismiss the case against Reyes considering it had based its decision to dismiss on representations from someone who may have misrepresented his identity; (2) he wanted the U.S. Attorney's Office to look into the matter; and (3) he thought the Government may want to hold Reyes as a

5

No. 11-40244

material witness. Judge Hacker further testified that, even if the dismissal order had been filed, he would have rescinded the order until everything was resolved. Eventually, on July 12, 2010, the order dismissing the illegal reentry case against Reyes was filed with the Clerk's Office, only then terminating the case against him.

The Clerk's Office was aware of the irregularities with Richardson's license because on June 29, Richardson had given Flores a "motion and order for admission pro hac vice."[4] On the motion, Richardson had filled out the date; case caption; his name; and his firm's name (The Law Office of Dale A. Richardson), address, and telephone number. He had signed it, as well. He had indicated that he was an attorney licensed in the Commonwealth of Massachusetts and in the Cherokee Nation, and provided purported bar numbers for each jurisdiction. Richardson had submitted additional documentation with the motion and order, including: (1) a Cherokee Nation "attorney badge"; (2) a certificate from the American Bar Association ("ABA"); and (3) bar cards from the ABA, Massachusetts Bar Association ("MBA"), and Cherokee Nation Bar Association. Flores file-stamped the motion as received in court on June 29, 2010. Relying on the representations in the motion and order, Judge Hacker granted the motion and signed it before the Clerk's Office verified Richardson's license information out of concern that verification would require holding Reyes in jail for another 24 hours when the Government had already moved to dismiss the case. The motion was then sent to the Clerk's Office for verification.

---

[4] A motion for admission pro hac vice is a motion submitted by an attorney that requests permission from the court to appear in front of it in a specific case because the attorney is not licensed in that specific jurisdiction. In general, it must be submitted by the attorney and granted by the court before the attorney can appear in the case.

6

No. 11-40244

As a general proposition, it should take only a few minutes for the Clerk's Office to verify an attorney's state and federal bar information, but when it received Richardson's motion, the Clerk's Office was unable to verify that he was licensed in Massachusetts based on the bar number he had provided. The Laredo Division Deputy Clerk, Kathy Johnson, contacted Richardson to ask whether he simply had provided an incorrect number. Richardson said no and gave her the same bar number. When she informed Richardson that she would have to inform Judge Hacker about the discrepancy, Richardson replied, "Well, you do whatever you have to do at your end[ ] [a]nd I will do whatever I have to do at my end." Johnson then notified Judge Hacker's chambers.

When Flores learned about the licensing issue, she contacted Richardson via email to request more documentation. Richardson responded on June 30. He attached the same documentation he had previously given her the day before, along with a letter from the Cherokee Nation Supreme Court stating he was licensed in its jurisdiction. He also stated that John Gill, an assistant federal public defender, would sponsor his motion for admission pro hac vice. In fact, this was a misrepresentation. Richardson had approached Gill in court on June 29 and, among other things, had asked Gill about the procedures for filing a motion for admission pro hac vice and if Gill would sponsor his admission. Gill, a recent hire to the federal defenders, was unsure of the procedures and requirements; thus, he asked Richardson to contact him after he had done further research. Richardson never contacted Gill, however, and Gill never agreed to sponsor Richardson's admission.

No. 11-40244

After he learned of the issues with Richardson's licensing, Judge Hacker referred the investigation to the U.S. Attorney's Office. The FBI initiated an investigation and uncovered the following information about Richardson.

Richardson was not licensed to practice law in Massachusetts, or any other jurisdiction. In fact, Richardson had never graduated from college or law school. Richardson's purported Massachusetts bar number was the internal number that had been assigned to him by the MBA in April 2009 when he applied for membership. The MBA is a voluntary bar association that offers benefits to members and promotes professional ethics, but it has no authority to license attorneys. Indeed, an individual does not need to be an attorney to join. Richardson had joined several voluntary bar associations, including the ABA and Texas State Bar Association.

On March 17, 2009, Richardson had applied for admission to practice in the Cherokee Nation, a tribal government in Oklahoma that has judicial authority over lands held by the tribe. The Supreme Court of the Cherokee Nation admits attorneys into its bar, provided the attorney submits an application and is a licensed attorney in good standing in another jurisdiction. The Cherokee Nation does not license attorneys, but only admits them to practice in its court system. On his application, Richardson stated he had graduated from "The California School of Law"[5] in 2007 and was licensed in California. He also had submitted a certificate of good standing from the

---

[5] The California School of Law is an online law school that opened in 2007 and graduated its first class in December 2011. The school's dean testified that the school had no record of Dale Allen Richardson having graduated from its program, although Dale Allen Richardson had submitted an informal application for admission to the school in January 2009.

No. 11-40244

Supreme Court of California that turned out to be fabricated from a basic template. Investigators also learned that the California bar number Richardson had provided on his application belonged to David Allen Richardson, a Sacramento, California, attorney who had been admitted to the California bar in December 2007. David Richardson testified that he never gave Richardson permission to use his bar number.

On April 30, 2009, Richardson received notice that his admission had been approved, although he never actually took the oath of admission. Along with its notice of admission, the Cherokee Nation had sent Richardson a bar card and assigned him a bar number. From these materials, Richardson had fabricated a Cherokee Nation "attorney badge." The FBI learned that the Cherokee Nation does not issue badges and, as pointed out during the trial, the badge had the seal of the State of Oklahoma instead of the seal of the Cherokee Nation. Richardson was disbarred by the Cherokee Nation Supreme Court in October 2010, after it learned he was not, in fact, licensed to practice law in any jurisdiction.

The FBI also learned that, on November 4, 2009, Richardson had applied for admission to the United States District Court for the Eastern District of Oklahoma under the name, David Allen Richardson, Jr. He had claimed to have attended "The Washington College of Law" and the "University of London," and to have been a member of the bars of the Cherokee Nation, Washington, D.C., and Massachusetts. He had submitted with his application his business card, ABA card, Cherokee Nation bar card, a certificate of good standing from the Supreme Court of the State of California, and a letter from the Cherokee Nation Supreme Court notifying Richardson of his admission to its court.

No. 11-40244

The FBI also located the website of Richardson's law office.  On the website, there was a picture of Richardson seated in front of a bookshelf with the Department of Homeland Security seal on the table.  He stated on the website that he was barred in the Cherokee Nation and an active member in good standing with several bar associations.  He further stated that he practiced matters of federal administrative law, U.S. immigration and naturalization law, Native American and tribal law, commercial law, and corporate law.  He listed experience before, *inter alia*, the Department of Justice; the Board of Immigration Appeals; the Department of Homeland Security; and the Internal Revenue Service.  The FBI also located a Facebook profile page for Richardson's law office that provided much of the same information.

### B.

On August 31, 2010, a federal grand jury returned a three-count indictment against Richardson.  Counts One and Two charged him with "corruptly influenc[ing], obstruct[ing], and imped[ing], and endeavor[ing] to influence, obstruct, and impede the due administration of justice" in Reyes's federal criminal case by "falsely representing himself to be an attorney" on June 4, and June 29, 2010, respectively, in violation of 18 U.S.C. § 1503.  Count Three charged Richardson with "willfully and knowingly mak[ing] and caus[ing] to be made a materially false, fictitious, and fraudulent statement and representation within the jurisdiction of the judicial branch" by representing "that he had a law license and that he was an attorney" in a motion for admission pro hac vice, when Richardson "then and there knew, he did not have a law license in any state and was not an attorney," in violation of 18 U.S.C. § 1001.

No. 11-40244

Richardson proceeded to trial by jury.  After the Government rested its case, he moved for a judgment of acquittal under Federal Rule Criminal Procedure 29(a), claiming that the evidence was insufficient to support a conviction on any of the counts of the indictment.  The district court denied the motion.  Richardson did not present any evidence.  The jury returned a guilty verdict on all counts.

During the sentencing hearing, the district court overruled objections Richardson lodged against enhancements to his offense level recommended by the probation officer in the pre-sentence report ("PSR").  Application of the five enhancements increased Richardson's offense level from 14 to 25, and with a criminal history category of I, the district court calculated his advisory guidelines range at 57-71 months.  The court sentenced him to 65 months of imprisonment on Counts One and Two, and 60 months on Count Three, all to run concurrently.  The district court also stated that, even if none, or some combination short of all five, of the enhancements had been applied to Richardson's offense level, it would have chosen the same 65-month sentence. The court made detailed findings under the 18 U.S.C. § 3553(a) factors to support its alternative, non-guidelines sentence consistent with its initial reasoning for selecting the 65-month sentence.

On appeal, Richardson challenges:  (1) the sufficiency of the evidence supporting his convictions; (2) the district court's refusal to instruct the jury on the term "corruptly" in accordance with his proposed definition; and (3) the district court's decision to apply the five enhancements to his offense level.  We address each in turn.

No. 11-40244

## II.

## A.

We review the district court's denial of a motion for judgment of acquittal *de novo. United States v. Steen*, 634 F.3d 822, 825 (5th Cir. 2011) (per curiam). Review is "highly deferential to the verdict," asking "whether the evidence, when reviewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a reasonable doubt." *United States v. Najera Jimenez*, 593 F.3d 391, 397 (5th Cir. 2010) (internal quotation marks omitted).

## B.

## 1.

We first address the sufficiency of the evidence supporting Richardson's convictions under 18 U.S.C. § 1503, before we turn to the same inquiry with respect to his 18 U.S.C. § 1001 conviction.

The jury found Richardson guilty of violating 18 U.S.C. § 1503 with respect to his actions in federal court on June 4, and June 29, 2010, respectively. Section 1503 provides in pertinent part:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, . . . in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, . . . in his person or property on account of the performance of his official duties, *or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to*

No. 11-40244

*influence, obstruct, or impede, the due administration of justice,*
shall be punished as provided in subsection (b).

18 U.S.C. § 1503 (emphasis added).

"Section 1503 was enacted to protect individuals involved in federal judicial proceedings and to prevent 'miscarriage[s] of justice by corrupt methods.'" *United States v. Williams*, 874 F.2d 968, 976 (5th Cir. 1989) (quoting *United States v. Vesich*, 724 F.2d 451, 453 (5th Cir. 1984)) (alteration in original). The statute is structured in two parts: the first part proscribes specific conduct, while the second part, referred to as the "omnibus clause," is a "catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 598 (1995); *see also Williams*, 874 F.2d at 976 ("The omnibus clause . . . clearly forbids *all* corrupt endeavors to obstruct or impede the due administration of justice." (emphasis in original)); *United States v. Howard*, 569 F.2d 1331, 1336-37 (5th Cir. 1978) (explaining that the omnibus clause "quite clearly proclaims that all obstructions of justice are prohibited"). "[D]rafted with an eye to the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined," *United States v. Griffin*, 589 F.2d 200, 206-07 (5th Cir. 1979) (internal quotation marks omitted), the omnibus clause "is far more general in scope than the earlier clauses of the statute," *Aguilar*, 515 U.S. at 598. Richardson was charged with violating the omnibus clause on two occasions, to wit: with "corruptly influenc[ing], obstruct[ing], and imped[ing], and endeavor[ing] to influence, obstruct, and impede the due administration of justice" in Reyes's federal criminal case by "falsely representing himself to be an attorney" on June 4, and June 29, 2010.

13

No. 11-40244

There are three essential elements that the Government must establish to prove a violation of § 1503: (1) that a judicial proceeding was pending; (2) that the defendant had knowledge of the judicial proceeding; and (3) that the defendant acted corruptly with the specific intent to influence, obstruct, or impede that judicial proceeding in its due administration of justice. *United States v. De La Rosa*, 171 F.3d 215, 220-21 (5th Cir. 1999); *United States v. Sharpe*, 193 F.3d 852, 864 (5th Cir. 1999); *Williams*, 874 F.2d at 977. In *Aguilar*, the Supreme Court described the interplay between these three elements as a "nexus" requirement–"that the act must have a relationship in time, causation, or logic with the judicial proceeding." *Aguilar*, 515 U.S. at 599. "[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding," as opposed to some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority, "he lacks the requisite intent to obstruct." *Id.*; *see also Howard*, 569 F.2d at 1337 ("Because section 1503 forbids interference with the 'administration of justice,' a prerequisite of its violation is a pending criminal proceeding."). Put another way, the Court has stated "the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Aguilar*, 515 U.S. at 599 (internal quotation marks omitted); *see also Sharpe*, 193 F.3d at 865 ("Under Section 1503, an act with the 'natural and probable effect' of interfering with the due administration of justice satisfies the intent requirement for obstruction of justice."); *Williams*, 874 F.2d at 980 (explaining that § 1503 "requires a specific intent to impede the administration of justice"). We have defined "due administration of justice" as "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony

14

No. 11-40244

when subpoenaed." *Williams*, 874 F.2d at 977 n.24 (internal quotation marks omitted); *Griffin*, 589 F.2d at 203 n.4; *Howard*, 569 F.2d at 1334 n.4. Thus, obstructing the due administration of justice means "interfering with the procedure of a judicial hearing or trial." *Howard*, 569 F.2d at 1337 n.9.

That the Government proved the first two elements is not disputed by Richardson. Instead, he argues the Government failed to prove the third element–that he acted corruptly with the specific intent to influence, obstruct, or impede Reyes's initial appearance hearings in their due administration of justice–because his conduct had no meaningful or material influence on Judge Hacker's decision to dismiss Reyes's illegal reentry case, nor could it have. According to Richardson, what actually influenced the decision to dismiss Reyes's illegal reentry case is the fact that Reyes had an appeal pending in the removal matter in immigration court, which he asserts the AUSAs had ample time to, and presumably did, verify between the two hearings. Richardson contends the fact that the AUSAs and Judge Hacker learned this from someone they believed was an attorney does not mean the decision to dismiss was based on any untruth. Finally, he maintains that his conduct did not actually interfere with or obstruct the due administration of justice because the Government decided not to withdraw its motion to dismiss the illegal reentry case against Reyes after learning of Richardson's true identity.

Richardson's arguments that his actions did not affect the decision to dismiss Reyes's illegal reentry case are foreclosed by long-settled authority holding that a defendant's actions do not need to be successful in obstructing or interfering with the due administration of justice because "an 'endeavor' suffices" to violate the statute. *Aguilar*, 515 U.S. at 599 (citing *United States v. Russell*,

255 U.S. 138, 143 (1921)). Put more succinctly, "success is irrelevant under section 1503." *Howard*, 569 F.2d at 1337; *see also Williams*, 874 F.2d at 981 ("It is settled that an *un*successful 'endeavor' to obstruct justice violates section 1503; justice need not actually have been obstructed." (emphasis in original)). "Section 1503 'makes an offense of *any* proscribed endeavor,' without regard to the technicalities of the law of attempts or of the doctrine of 'impossibility.'" *Williams*, 874 F.2d at 981 (quoting *Osborn v. United States*, 385 U.S. 323 (1966)) (emphasis in original); *see also United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992) (same). This is because § 1503

> does not forbid interferences with doing "justice," in the sense of "fairness" and "rightness," although undoubtedly it has an effect to do so. Instead, it forbids interferences with the "administration of justice," which means judicial procedure. Section 1503 is a contempt statute, and as such is directed at disruptions of orderly procedure. Thus, it is wholly irrelevant whether defendants' actions had any ultimate effect on the outcome of the [judicial proceeding] . . . .

*Howard*, 569 F.2d at 1337 (internal citations omitted); *see also Williams*, 874 F.2d at 981 ("[The appellants'] false denials of knowledge of events when questioned about them hindered the grand jury's attempts to gather evidence of the fuel shorting scheme as effectively as if they had refused to answer the questions at all."); *Griffin*, 589 F.2d at 204 ("By falsely denying knowledge of events and individuals when questioned about them, Griffin hindered the grand jury's attempts to gather evidence of loansharking activities as effectively as if he refused to answer the questions at all."). And, when a defendant disturbs the orderly procedure of justice, he can bring about a miscarriage of justice "by imperiling the innocent or delaying the punishment of the guilty." *Griffin*, 589 F.2d at 204. Section 1503 does not tolerate such conduct.

No. 11-40244

What the testimony and evidence from Richardson's trial do show is that Richardson corruptly endeavored to influence, obstruct, and impede the due administration of justice during the initial appearance hearings by falsely representing himself to be an attorney and by representing that Reyes had an appeal pending in the immigration court. Richardson went to great lengths to present himself to the public as an attorney who specialized in immigration matters. He appeared in federal court on June 4, and June 29, 2010, alongside Reyes and stated to the AUSAs, Judge Hacker, and Judge Hacker's courtroom deputy that he was representing Reyes. He negotiated with the AUSAs on both days. There was no need for him to state explicitly that he was an attorney; his actions on June 4 and June 29 made that representation clear to those in the courtroom. Moreover, on both days, he informed the AUSAs and Judge Hacker that Reyes had an appeal pending in the immigration court that they were under the impression could undermine the entire basis for his illegal reentry charge. This information caused AUSA Guardiola to request a reset of the case on June 4, which Judge Hacker granted. Then, on June 29, this information and Richardson's negotiations prompted AUSA Pimental to request that Judge Hacker dismiss the case. Richardson succeeded initially in his endeavor, thwarted only by his motion for admission pro hac vice. Judge Hacker testified that, had that not occurred–and the case against Reyes dismissed and the true identity of Richardson never revealed–then the initial appearance hearings would have been invalid.

Thus, a reasonable jury could have readily inferred from the evidence and testimony presented at trial that Richardson's actions had the natural and probable effect of interfering with the due administration of justice during the

17

No. 11-40244

initial appearance hearings.  His actions were aimed at influencing, obstructing, and impeding the orderly procedure of justice in Reyes's illegal reentry case. The fact that his endeavor may not have ultimately affected the decision to dismiss Reyes's illegal reentry case is wholly irrelevant.  The jury could have inferred, moreover, that the Government had other reasons not to withdraw its motion to dismiss, such as the fact that Reyes was a victim of Richardson's more serious assault on the criminal justice system.  Accordingly, we hold sufficient evidence supported the jury's conclusion that Richardson acted corruptly with the specific intent to influence, obstruct, or impede the two hearings in their due administration of justice.

2.

Richardson next argues that there was insufficient evidence to support his conviction for knowingly making a materially false statement under 18 U.S.C. § 1001.  Section 1001 prohibits "knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation" "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."  18 U.S.C. § 1001(a)(2).  A conviction requires the Government to prove five elements beyond a reasonable doubt: "(1) a statement, (2) falsity, (3), materiality, (4) specific intent, and (5) agency jurisdiction."  *United States v. Elashyi*, 554 F.3d 480, 497 (5th Cir. 2008) (internal quotation marks omitted).

Richardson argues that the Government failed to prove that his false statements were material to the decision of the AUSAs and Judge Hacker to dismiss Reyes's illegal reentry case because what actually influenced that decision was the "undisputed fact" that Reyes had a pending appeal in the

immigration case.  He further contends that no evidence was presented that Judge Hacker had knowledge of Richardson's motion for admission pro hac vice before signing Reyes's dismissal order or that there was any information in the motion relevant to the decision to dismiss Reyes's illegal reentry case.  He also asserts that the immateriality of the statement is shown by the Government's decision not to withdraw its motion to dismiss Reyes's case after learning Richardson's true identity.  Finally, he maintains that the motion was not in and of itself capable of causing the dismissal of Reyes's case because when a defense attorney moves to dismiss a case, an evidentiary hearing is required.

In *United States v. Gaudin*, 515 U.S. 506 (1995), the Supreme Court provided the framework for analyzing the materiality of a false statement and whether such a statement could influence a government decision:

> Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made?" and (b) "what decision was the agency trying to make?" The ultimate question: (c) "whether the statement was material to the decision" requires applying the legal standard of materiality . . . to these historical facts.

*Id.* at 512.  A material statement must have "'a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* at 509 (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)) (alteration in original).  "Actual influence or reliance by a government agency is not required.  The statement may still be material 'even if it is ignored or never read by the agency receiving the misstatement.'" *United States v. Puente*, 982 F.2d 156, 159 (5th Cir. 1993) (quoting *United States v. Diaz*, 690 F.2d 1352, 1358 (11th Cir. 1982)).  The standard "is not whether the false

No. 11-40244

statement actually influenced a government decision or even whether it probably influenced the decision; the standard is whether the misrepresentation was *capable* of influencing the agency decision." *Id.* (emphasis in original); *see also Najera Jimenez*, 593 F.3d at 400 (same).

Applying this analytical framework, the parties do not dispute that the relevant false statements were: (1) that Richardson was an attorney; and (2) that he was licensed to practice law. With respect to the second question, what decision was the agency–in this case Judge Hacker–trying to make, we believe the relevant decision was whether to grant or to deny Richardson's motion for admission pro hac vice. Richardson's arguments regarding materiality flow from the premise that the relevant decision was whether to dismiss Reyes's illegal reentry case. We disagree. The purpose of a motion for admission pro hac vice is to gain the court's permission to appear in a particular case because the attorney is not already licensed in that jurisdiction. It has nothing to do with substantive legal rulings, except to the extent it allows an attorney to appear in a court to make those arguments. Thus, we conclude the relevant decision Judge Hacker was trying to make was whether to grant or to deny Richardson's motion for admission pro hac vice.

Framed thusly, we apply the legal standard of materiality to the two historical facts: whether Richardson's false statements that he was an attorney and licensed in another jurisdiction were capable of influencing Judge Hacker's decision to grant or to deny his motion for admission pro hac vice. Not only were these statements capable of influencing Judge Hacker's decision to grant the motion for pro hac vice admission, but he testified that they did in fact influence his decision because after Richardson filed his motion and order with Flores in

20

court on June 29 and before the Clerk's Office received the motion for verification on June 30, Judge Hacker granted the motion and signed the order admitting Richardson pro hac vice. Judge Hacker explained that, if an attorney is not admitted in the Southern District of Texas, he must submit the motion and order for admission pro hac vice. He then explained his concern that, because Reyes was not a felony defendant who would linger in the system several months, he relied on Richardson's false statements in the motion and granted the motion before the Clerk's Office verified Richardson's license information because the Government had represented to Judge Hacker that it wanted to dismiss Reyes's case based on Richardson's other misrepresentations. Of "primary concern" to Judge Hacker was not detaining a man the Government had decided not to prosecute. Thus, after reviewing the statements made in the motion and order, Judge Hacker granted and signed the motion and order to effectuate promptly Reyes's release. The fact that the order granting admission pro hac vice to Richardson was never filed is of no moment; Richardson's false statements actually influenced, and at minimum, were capable of influencing Judge Hacker's decision to grant or to deny his motion for admission pro hac vice. Accordingly, a reasonable jury could have readily inferred that Richardson's false statements were material to Judge Hacker's decision whether to grant or to deny Richardson's motion for admission pro hac vice.

In sum, we hold that sufficient evidence supported Richardson's convictions for obstruction of justice and knowingly making a false statement to a government agency.

No. 11-40244

III.

A.

Richardson next assigns error to the district court's refusal to instruct the jury on the term "corruptly" in accordance with his proposed definition. We review a district court's jury instructions for abuse of discretion, considering "whether the instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005) (quoting *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002)).

B.

We have defined the third essential element of obstruction of justice under 18 U.S.C. § 1503 as requiring "that the defendant acted corruptly with the specific intent to influence, obstruct, or impede [the judicial] proceeding in its due administration of justice." *De La Rosa*, 171 F.3d at 220-21 (citing *Williams*, 874 F.2d 976-77). Tracking verbatim the Fifth Circuit pattern jury instruction, the district court instructed the jury on this element as follows: "That the defendant's act was done 'corruptly,' that is, that the defendant acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice." *See* Fifth Circuit Pattern Jury Instruction § 2.65 (2001). Richardson argued to the district court, and argues to this court, that the jury should have been instructed that "corruptly" means as follows:

> "[C]orruptly" is the adverbial form of the adjective "corrupt," which means "depraved, evil: perverted into a state of moral weakness or wickedness . . . of debased political morality; characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements."

*United States v. Poindexter*, 951 F.2d 369, 378 (D.C. Cir. 1991) (citation omitted and alteration in original).  The district court rejected this definition because it found the pattern jury instruction was sufficient and a correct statement of the law.

A district court has substantial latitude in framing jury instructions.  In order to demonstrate the district court abused its discretion in refusing to give a proposed instruction, the defendant must demonstrate "that the requested instruction (1) was a correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense."  *United States v. Smithson*, 49 F.3d 138, 142 (5th Cir. 1995).  "It is well-settled," however, "that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law."  *United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009) (citing *United States v. Turner*, 960 F.2d 461, 464 (5th Cir. 1992)).  Because the district court's instruction tracked this circuit's pattern jury instruction, we need only determine whether the charge is a correct statement of the law.

Richardson points to no authority holding that the pattern jury instruction's definition of "corruptly" is an incorrect statement of the law.  Instead, he contends that his proposed definition was encompassed by how we defined "corruptly" in *United States v. Haas*, 583 F.2d 216 (5th Cir. 1978).  In *Haas*, the defendant had been charged with corruptly endeavoring to influence and impede a grand juror by communicating information about a matter before the grand jury.  *Id.* at 218.  The district court dismissed the indictment for

failure to allege essential elements of knowledge and intent. *Id.* We held that the indictment, which tracked the language of 18 U.S.C. § 1503, did not need to contain those technical terms because it recited facts and used language which, taken as a whole, indicated knowledge and intent. *Id.* Both parties had agreed that knowledge and intent were necessary to sustain a conviction. *Id.* at 220. In holding that the technical terms knowledge and intent were not necessary in the indictment, we defined the term "corruptly" as meaning "for an improper motive," or "an evil or wicked purpose." *Id.* (internal quotation marks omitted); *see also United States v. Partin*, 552 F.2d 621, 642 (5th Cir. 1977) ("The second paragraph begins by stating, correctly, that the word 'corruptly' in § 1503 'means a defendant acted with improper motive or with bad or evil or wicked purpose.'" (quoting *United States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1971)). We then explained that its use with "endeavor" charged an "intentional act." *Haas*, 583 F.2d at 220. "Corruptly," therefore, we determined to be "interchangeable with the term 'willful.'" *Id.* (quoting *Seawright v. United States*, 224 F.2d 482 (6th Cir. 1955) (use of "willfully" in the indictment renders the term "corruptly" unnecessary)).

Even assuming that the *Poindexter* court's definition of "corruptly" is consistent with how we defined the term in *Haas*,[6] we disagree with Richardson's contention that the pattern jury instruction's definition does not

---

[6] We note that the D.C. Circuit did not endorse this definition of "corruptly" in *Poindexter*; instead, it noted that it had previously quoted several dictionary definitions of the word "corrupt" in a different case. *Poindexter*, 951 F.2d at 378. Furthermore, *Poindexter* concerned whether 18 U.S.C. § 1505–not § 1503–was unconstitutionally vague as applied to the defendant's conduct due to the possible ambiguity of the word "corruptly." *Id.* Finally, we point out that Congress later defined the term "corruptly" for purposes of § 1505. *See* 18 U.S.C. § 1515(b).

encompass our definition from *Haas*.   The pattern jury instruction defines "corruptly" as "knowingly and dishonestly."  We said in *Haas* that knowledge is necessary to sustain a conviction, *id.*, and "knowingly" is used in the pattern instruction.   "Knowingly" can mean "having or showing awareness or understanding," or "deliberately" or "consciously."  Black's Law Dictionary 950 (9th ed. 2009).  "Dishonestly" is defined as conduct "involving bad faith," "a lack of integrity, or moral turpitude."  *Id.* at 536, 733.  Thus, acting "knowingly and dishonestly" means acting deliberately or consciously in bad faith or with a lack of integrity or moral turpitude.  Because those meanings are consistent with how we defined "corruptly" in *Haas*–i.e., acting with an improper motive or an evil or wicked purpose, or acting willfully–Richardson cannot show that the pattern jury instruction is an incorrect statement of the law.  As a consequence, the district court did not abuse its discretion in refusing to give his proposed definition of the term.

## IV.

### A.

Finally, Richardson argues that the district court erred in applying five enhancements to his offense level when it calculated his advisory guidelines range and selected his sentence.  We review a sentencing decision for reasonableness, applying the familiar abuse-of-discretion standard.  *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).  This review occurs in a bifurcated process:  First, although the guidelines are advisory post-*Booker*, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the [g]uidelines range."  *Id.*  Second, we "consider[ ] the 'substantive reasonableness

of the sentence imposed under an abuse-of-discretion standard.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).  In undertaking this analysis, we review the district court's interpretation of the United States Sentencing Guidelines ("U.S.S.G.") *de novo*, and its factual findings in applying the guidelines for clear error.  *Whitfield*, 590 F.3d at 365-66.  "There is no clear error if the district court's finding is plausible in light of the record as a whole." *Cisneros-Gutierrez*, 517 F.3d at 764 (internal quotation marks omitted).

B.

In calculating Richardson's guidelines range, the probation officer assigned a base offense level of 14.  *See* U.S.S.G. § 2J1.2(a) (2010).  The probation officer then applied five enhancements to the offense level: (1) a three-level enhancement because the "offense resulted in substantial interference with the administration of justice," *id.* § 2J1.2(b)(2); (2) a two-level enhancement because the offense "involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects," *id.* § 2J1.2(b)(3)(A); (3) a two-level enhancement because "the defendant knew or should have known that a victim of the offense was a vulnerable victim," *id.* § 3A1.1(b)(1); (4) a two-level enhancement because "the defendant was an organizer, leader, manager, or supervisor in any criminal activity," *id.* § 3B1.1(c); and (5) a two-level enhancement because the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense," *id.* § 3B1.3.  Richardson objected to the enhancements' application, but the probation officer overruled his objections.  The district court also overruled the objections and adopted the PSR.  An adjusted offense level of 25,

No. 11-40244

coupled with a criminal history category of I, resulted in a guidelines range of 57-71 months.

Before imposing the sentence, the district court heard testimony from Lisa Leyva, Richardson's secretary. Leyva testified that she met Richardson in August 2010–after he knew he was under investigation in the instant case–at the immigration court in Dallas, Texas. Leyva was there to get an immigration bond for her deported husband when she struck up a conversation with Richardson. He informed her that he was an immigration attorney and that he could get her husband back in the United States with a visa in two weeks if she would agree to work as his secretary. Leyva agreed. Richardson also told her he would pay her a salary, although he ultimately paid her sporadically in small sums of thirty to fifty dollars.

Leyva worked for Richardson from August until the day before he went to trial in the instant case in October 2010. According to Leyva, he was still taking on new clients throughout this entire period. She explained that Richardson charged a flat $2,500 fee for his services, and then additional fees depending on the paperwork involved. The Government introduced several signed contracts between clients and Richardson, including one between Richardson and Reyes's mother, which detailed his billing arrangements. The contracts indicated billings of at least $25,000 during the time period Leyva worked for Richardson. She was in contact with approximately 15 clients during the time she worked for Richardson, although she testified that Richardson had told her he had approximately 80 clients. Described by Leyva as "vulnerable," Richardson's clients were aliens who were in immediate need of legal representation in immigration proceedings, many of which were deportations. Leyva testified that

27

Richardson made promises to all of them, but he left his promises, including the one he made to Leyva to bring her husband back into the country, unfulfilled.

After hearing testimony and overruling Richardson's objections, the district court explained to Richardson its concerns and thoughts underlying its sentencing decision. Of the belief that Richardson did not want to help people with immigration issues as he claimed, the district court found Richardson's ego to be the real driving force behind his offenses inasmuch as he found a way to manipulate successfully the judicial system undetected. And, although Reyes's illegal reentry case was dismissed ultimately, the district court admonished Richardson that the Government could have elected to prosecute Reyes again after it discovered Richardson's true identity. The court also noted that the Government detained Reyes as a material witness for many months, which did not please him. Regardless, the district court emphasized that all of the people Richardson attempted to and did represent were entitled to have legitimate legal representation, and that Richardson delivered nothing but false hope to them. The district court was further troubled by what it perceived to be deep-seated issues in Richardson's personal background on account of the extensive manner in which Richardson went about presenting himself as a lawyer. It also expressed concern about information it had received indicating that Richardson had somehow obtained a pharmacy technician license, even though he did not have the qualifications to obtain one legitimately. Finally, the court found it unacceptable that Richardson's actions had undermined the integrity of our judicial system.

With these concerns iterated, the district court imposed a term of 65 months of imprisonment on Counts One and Two, and 60 months of

No. 11-40244

imprisonment on Count Three, all to run concurrently. After the district court finished announcing its sentence, the Government asked the court whether it would state on the record that it would have imposed the same sentence, notwithstanding the enhancements that had been applied to Richardson's offense level. If none of the enhancements had been applied, an offense level of 14 with a criminal history category of I would have yielded a guidelines range of 15-21 months.

The district court stated that it would have imposed the same sentence even if none of the enhancements, or any combination of the enhancements short of all five, had been applied to Richardson's offense level. The court stated that it had considered each of the 18 U.S.C. § 3553(a) factors and weighed them in considering a sentence, but had determined that any of the resulting guidelines ranges "would be insufficient in this case." In analyzing the nature and circumstances of the offense and history and characteristics of the defendant, the court reasoned that Richardson "engaged in extensive conduct designed more than anything else to pass himself off as a licensed attorney" "over an extensive period of time with an extensive number of clients." *See* 18 U.S.C. § 3553(a)(1). The court found that Richardson had benefitted financially from his conduct, had lied in multiple jurisdictions, and had victimized a vulnerable group of society. The court again noted its belief that money was not Richardson's sole motivator; instead, the court found that Richardson believed he was of above-average intelligence to pull off his scheme and went to great lengths to do so. The court concluded that the nature of his offenses amounted to an attack on the integrity of the judicial system.

No. 11-40244

A sentence of 65 months, furthermore, was necessary to promote Richardson's respect for the law. *See id.* § 3553(a)(2)(A). The court concluded that Richardson not only violated the law, but attacked and manipulated the core of the judicial system by passing himself off as an attorney. The court also determined that 65 months was necessary to provide just punishment for Richardson's offenses. *See id.* The court again cited its belief that, based on the evidence that Richardson had somehow obtained a pharmacy technician license number, he was preparing to branch into another licensed profession even while he was attempting to pass himself off as an attorney during the relevant time period. Moreover, the court was disturbed by the fact that Richardson had continued to take new clients while he was under investigation in the instant case, then under indictment, and then under pretrial release. *See id.* § 3553(a)(2)(B). Finally, the court stressed that a sentence of 65 months was necessary to protect the public from Richardson's future crimes because of its concern that, when released, he would continue to engage in criminal conduct. *See id.* § 3553(a)(2)(C).

Richardson contends that the district court erred in applying each of the enhancements. He has not appealed any aspect of the district court's alternative, non-guidelines sentence. The Government responds with specific arguments in support of the application of each enhancement, and also argues that, because the district court stated it would have imposed the same sentence even if it had sustained some or all of Richardson's objections to the enhancements, then any error in calculating Richardson's guidelines range was harmless. We agree. Even assuming that the district court erred in applying one or more of the enhancements to Richardson's offense level, the Government

No. 11-40244

has demonstrated that any such error in calculating the guidelines range was harmless.[7]

There is no dispute but that a district court commits procedural error by improperly calculating the guidelines range. *Gall*, 552 U.S. at 51; *United States v. Ibarra-Luna*, 628 F.3d 712, 717 (5th Cir. 2010). As a consequence, "an incorrect [g]uidelines calculation will usually invalidate the sentence." *Ibarra-Luna*, 628 F.3d at 717. We will not vacate and remand for resentencing, however, if the guidelines calculation error is harmless–that is the error "did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). We have held that a guidelines calculation error is harmless where the district court has considered the correct guidelines range and has stated that it would impose the same sentence even if that range applied. *United States v. Duhon*, 541 F.3d 391, 396 (5th Cir. 2008); *United States v. Bonilla*, 524 F.3d 647, 656 (5th Cir. 2008). Even if a court did not consider the correct range, an error in the guidelines calculation can still be considered harmless if the proponent of the sentence "convincingly demonstrates both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *Ibarra-Luna*, 628 F.3d at 714. This is a "heavy burden," and

---

[7] The Government argues that Richardson's arguments with respect to certain enhancements are subject to plain error review because he attacked the enhancements on different grounds before the district court. Because we conclude that the Government can meet its burden as the proponent of the sentence and show that any error in calculating the guidelines range was harmless, we need not decide whether certain of Richardson's arguments should be subject to plain error review.

No. 11-40244

one that requires the proponent to "'point to evidence in the record that will convince [the appellate court] that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error.'" *Id.* at 717, 718 (quoting *United States v. Huskey*, 137 F.3d 283, 289 (5th Cir. 1998)).

We conclude the Government, as proponent of the sentence, has met its burden in showing that any error the district court may have made in applying one or more of the enhancements was harmless. The court stated that "even if the Court began with the base offense level that we have here now and considered, you know, either no enhancements whatsoever, or enhancement-by-enhancement, the Court believes that each one of those resulting Guideline ranges would be insufficient in this case." It further explained that it had considered each of the § 3553(a) factors and weighed them accordingly. The district court then went on to analyze each of the 18 U.S.C. § 3553(a) factors and its applicability to Richardson and his conduct. It noted that he had engaged in an extensive scheme to pass himself off as a licensed attorney over a substantial period of time to many clients. He had lied in a number of jurisdictions and had victimized a vulnerable group of society. Furthermore, the district court was of the view that money was not Richardson's sole motivation, but instead that he believed he was of above-average intelligence so as to pull off the scheme. The district court also emphasized that Richardson's conduct amounted to an attack on the integrity of the judicial system. The court's chosen sentence was further necessary to promote Richardson's respect for the law, provide just punishment for his offenses, and protect the public from his future crimes.

Accordingly, because the district court stated that it had: (1) considered all of the possible guidelines ranges that could have resulted if it had erred in

No. 11-40244

applying one or more of the enhancements to Richardson's offense level; (2) found all of those resulting ranges to be insufficient in this case, and (3) stated that it would have imposed the same 65-month sentence even if one of those ranges had applied, we hold that any error the district court made in calculating the guidelines range was harmless.

V.

In sum, we hold that the evidence adduced at trial supported the jury's verdict; the district court did not abuse its discretion in refusing to instruct the jury in accordance with Richardson's definition of "corruptly"; and assuming the district court erred in applying one or more of the enhancements to Richardson's offense level, thereby incorrectly calculating the advisory guidelines range, the Government, as proponent of the sentence, has discharged its burden to show that Richardson's substantial rights were not affected by any error because the district court made detailed, alternative findings that it would have sentenced Richardson to 65 months of imprisonment, notwithstanding whether any or some of the enhancements were applied to his offense level.

AFFIRMED.